UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CARPENTERS INDUSTRIAL COUNCIL,** 12788 SE Stark Street Portland, OR 97233; **AMERICAN FOREST RESOURCE COUNCIL,** 1500 SW First Avenue, Suite 765 Portland, OR 97201; **SWANSON GROUP, INC.,** 2695 Glendale Valley Road Glendale, OR 97442; **ROUGH & READY LUMBER CO.,** 30365 Redwood Highway Cave Junction, OR 97523; and **PERPETUA FORESTS COMPANY,** 30365 Redwood Highway Cave Junction, OR 97523, **SENECA JONES TIMBER COMPANY,** 90201 Highway 99 Eugene, OR 97402 | Civil Case No. |

Plaintiffs,

v.

**DIRK KEMPTHORNE**, Secretary of Interior,
1849 C Street, NW
Washington, D.C. 20240

Defendant

## COMPLAINT

(Action for Declaratory and Injunctive Relief to Remedy Violations of the National
Environmental Policy Act, 42 U.S.C. §§ 4321 *et. seq.*, Regulatory Flexibility Act, 5 U.S.C.
§§601 *et seq.* and Unfunded Mandates Reform Act, 2 U.S.C. §§1501 *et seq.* and abuse of
discretion under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*)

For their complaint herein, plaintiffs allege as follows:

## INTRODUCTION

1.      This is an action against the Hon. Dirk Kempthorne, in his official capacity as Secretary

of Interior, for declaratory and injunctive relief for violations of the National Environmental Policy

Act (NEPA), 42 U.S.C. §§ 4321 *et. seq.*, the Regulatory Flexibility Act, 5 U.S.C. §§601 et seq. and

Page 1 - Complaint

the Unfunded Mandates Reform Act, 2 U.S.C. §§1501 et seq. and unlawful abuse of discretion under

the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq*., by the United States Fish and Wildlife

Service (FWS) concerning its Final Rule revising the designation of critical habitat for the northern

spotted owl.  73 Fed. Reg. 47326 (Aug. 13, 2008) (Final Rule).

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal

question), 2201 (declaratory relief) and 2202 (injunctive relief).  Plaintiffs have challenged final

agency action as defined by the Administrative Procedures Act (APA), 5 U.S.C. § 704.  Venue in

this district is proper under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions

giving rise to the claims occurred in this district, and the defendant resides in this district.

## PARTIES

3.   Plaintiff Carpenters Industrial Council (CIC) is a labor organization that represents some

10,000 forest products workers in Oregon, Washington and northern California, and about 120,000

members nationwide.  The CIC was chartered July 1, 2006, by the United Brotherhood of Carpenters

and Joiners of America, which is headquartered in Washington, D.C.  The CIC was formed after the

merger of four Regional Industrial Councils -- the Carpenters East Coast Industrial Council, the

Midwestern Council of Industrial Workers, the Southern Council of Industrial Workers, and the

Western Council of Industrial Workers.  Many members of CIC live in remote communities that are

heavily dependent on timber, particularly federal timber sold by the U.S.D.A. Forest Service and

U.S.D.I. Bureau of Land Management (BLM).  Several thousand of these workers have experienced,

and continue to be threatened with, permanent job loss by the timber supply reductions resulting

from land management restrictions imposed for the protection of the northern spotted owl and its

Page 2 - Complaint

critical habitat.  There are few, if any, prospects to replace CIC members' jobs at a comparable wage in their home towns.  Many CIC members use Forest Service and BLM forests for recreation, enjoyment, solitude and other purposes, and have a keen interest in maintaining the long-term health and stability of these forests, and in achieving the environmentally-sound and sustainable management of all the resources of these forests.

4.  Plaintiff American Forest Resource Council (AFRC), a nonprofit corporation organized under the laws of the state of Oregon, is a forest products trade association located in Portland, Oregon which represents approximately 90 forest product manufacturing companies and landowners throughout the states of Oregon, Washington, California, Idaho, Montana and elsewhere in the midwestern and western United States.  AFRC and its members actively participate in federal agency land management decisions that involve the allocation and use of forest resources in California, Oregon and Washington, including wildlife, recreation and commodity production.  AFRC and its members utilize all the resources of the lands managed by the Forest Service and BLM in those states and elsewhere, and have a strong interest in the environmentally-sound and sustainable management of those resources.

5.  AFRC and its predecessors have served as the representative for the forest products industry on major regional federal land management decisions since 1986.  AFRC collects information about the environmental, economic and social impacts of these major federal land management decisions, and disseminates this information to its members and participants, to public officials and to thousands of members of the public that are directly affected by these decisions.

6.  One of AFRC's primary purposes is to represent the interests of its members on matters relating to federal timber supply.  Many of AFRC's members purchase or seek to purchase timber

Page 3 - Complaint

sales sold by the Forest Service and BLM in the portions of Oregon, California and Washington that contain forests used or potentially used by northern spotted owls. Many of AFRC's members have been unable to purchase timber sales required to supply raw materials for their manufacturing facilities as a result of restrictions on land management by the Forest Service and BLM stemming from the listing of the northern spotted owl and the subsequent designation of critical habitat for the species. Operations of purchased sales have been delayed for years because of Section 7 consultation over the effects of the sales on spotted owl critical habitat.

7. AFRC also represents the interests of its members who own private forest land, including many who own private forest land in the region used or potentially used by northern spotted owls. Many AFRC members own parcels of forest land that is intermingled with or adjacent to the federal lands used, potentially used or designated as critical habitat for the northern spotted owl. Their management of these parcels of land has been and will be directly and adversely affected by the Final Rule challenged in this case. The risk of fire, disease or insect infestation starting on federal land and spreading to adjoining private land will increase as a result of the Final Rule because Section 7 consultation obligations for federal agencies regarding modification of critical habitat may significantly delay or prevent the implementation of hazardous fuel reduction projects on the designated lands. This presents a threat to AFRC members' lands in the vicinity of the federally designated critical habitat. Access to their lands through federal land may also be restricted. AFRC's members may be forced to manage their lands in a different and less environmentally desirable manner in response to the Final Rule.

8. Plaintiff Swanson Group, Inc. (Swanson) is a family-owned business that operates five forest products manufacturing facilities in Glendale, Roseburg, Springfield, and Noti, Oregon and

Page 4 - Complaint

employs approximately 900 workers at its sawmills and related operations. Swanson and its affiliates comprise one of the largest purchasers in Oregon of timber sales offered by the Forest Service and BLM. Without an adequate supply of Forest Service and BLM timber, Swanson may not be able to continue to operate all five of its facilities and keep its current work force employed. In fact, because of a shortage of reasonably priced logs from federal forests that would help the company remain competitive in the current depressed lumber market, Swanson has curtailed operations at several of its facilities.

9. Plaintiff Rough & Ready Lumber Co. (Rough & Ready) is a family owned manufacturer of timber and wood products located in Cave Junction, Oregon. Rough & Ready employs approximately 90 workers at its mill and associated facilities. Rough & Ready has historically depended heavily on timber sold by the Forest Service and BLM in western Oregon for the supply of raw materials needed to operate its processing facility. Rough & Ready continues to depend on an adequate supply of Forest Service and BLM timber to continue to operate, and to provide employment for its workers. Rough & Ready holds BLM timber sale contracts that have been delayed for more than a year for Section 7 consultation concerning spotted owl critical habitat.

10. Plaintiff Perpetua Forests Company (Perpetua) is under the same ownership as Rough & Ready, and supplies timber to Rough & Ready. Perpetua owns approximately 28,000 acres of forest land in Jackson, Josephine and Douglas Counties, Oregon. These forested acres provide a supply of timber to complement Rough & Ready's purchases of federal timber sales. This privately-held forest land provides recreation for Perpetua and Rough & Ready employees and their families. Most of the Perpetua forest land is adjacent to or intermingled with federal land affected by restrictions imposed for the protection of the northern spotted owl including restrictions on access across federal lands to

Page 5 - Complaint

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

reach Perpetua's private land.  Perpetua is deeply concerned that the designation of critical habitat on adjacent or intermingled federal lands will delay or prevent forest health maintenance and restoration activities in the designated areas which will create a severe risk that insects, disease or wildfire will spread from adjacent areas of designated critical habitat to its private timberland, potentially damaging or destroying its property.

11.    Plaintiff Seneca Jones Timber Company (Seneca) is a family-owned Oregon limited partnership based in Eugene, Oregon.  Seneca owns approximately 165,000 acres of forest land in Marion, Lane, Douglas, Curry, Jackson, Linn, Benton, Coos and Josephine Counties, Oregon.  These forested acres provide a supply of timber to Seneca Sawmill Company, which also purchases federal timber sales.  This privately-held forest land provides recreation for Seneca employees and their families.  Seneca owns forest land that is adjacent to or intermingled with federal land designated critical habitat and is affected by restrictions imposed for the protection of the northern spotted owl. Seneca is concerned that the Final Rule may restrict or delay access to its private land over federal land.  Seneca is deeply concerned that the designation of critical habitat on adjacent or intermingled federal lands will delay or prevent forest health maintenance and restoration activities in the designated areas which will create a severe risk that insects, disease or wildfire will spread from adjacent areas of designated critical habitat to its private timberland, potentially damaging or destroying its property.

12.    Defendant Dirk Kempthorne, the Secretary of the Interior, is the official charged with administering the Endangered Species Act with respect to the northern spotted owl.  Defendant supervises the FWS, which issued the Final Rule challenged in this case.

## BACKGROUND ALLEGATIONS

Page 6 - Complaint

13.    The Bureau of Land Management (BLM) manages approximately 2.4 million acres of BLM land in western Oregon under the terms of the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 (O&C Act), 43 U.S.C. § 1181a.  Congress enacted the O&C Act in 1937 requiring that O&C timberlands be managed on a long-term sustained yield basis to provide economic stability to local communities and industries:

> [O & C lands] classified as timberlands . . . shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities.
>
> The annual productive capacity for such lands shall be determined and declared . . . [but until then] the average annual cut therefore shall not exceed one-half billion feet board measure: Provided, that timber from said lands in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market.

43 U.S.C. § 1181a.

14.    In *Headwaters, Inc. v. BLM*, 893 F.2d 1012, 1013 (9th Cir. 1989), the court ruled: "Under the O&C Act, O&C land must be managed for the primary purpose of sustained yield timber production unless such lands are unsuitable for timber production."  In another decision the same court rejected claim by the same group that the phrase "forest production" used in the O&C Act encompassed not only timber production, but also conservation values such as preserving the habitat of the northern spotted owl:

> Headwaters' proposed use--exempting certain timber resources from harvesting to serve as wildlife habitat--is inconsistent with the principle of sustained yield.  As the [O&C Act] clearly envisions

Page 7 - Complaint

> sustained yield harvesting of O&C Act lands, we conclude that
> Headwaters' construction is untenable. There is no indication that
> Congress intended "forest" to mean anything beyond an aggregation
> of timber resources.

*Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174 (9th Cir. 1990), *rehearing denied*,

940 F.2d 435 (9th Cir. 1991). The court then explained that:

> It is entirely consistent with these goals to conclude that the
> O&C Act envisions timber production as a dominate use, and that
> Congress intended to use "forest production" and "timber production"
> synonymously. Nowhere does the legislative history suggest that
> wildlife habitat conservation or conservation of old growth forest is a
> goal on a par with timber production, indeed that it is a goal of the
> O&C Act at all.

*Id.* at 1184. The O&C timberlands were specifically meant to be a "vast, self-sustaining timber

reservoir for the future." *Id.*

15.    The spotted owl (*strix occidentalis)* is a medium-sized nocturnal bird that inhabits forests

of western North America from southern British Columbia through Washington, Oregon, California,

Arizona and New Mexico and into northern Mexico. Three subspecies of the spotted owl have been

recognized: northern (*strix occidentalis caurina*), California (*strix occidentalis occidentalis*) and

Mexican (*strix occidentalis lucida*).

16.    The ESA protects fish, wildlife and plants through the process of "listing" a species of

fish or wildlife or plants as threatened or endangered. 16 U.S.C. §1533(c)(1). On June 26, 1990

FWS listed the northern spotted owl as a threatened species throughout its range. 55 Fed. Reg.

26114.

17.    The ESA directs the Secretary in some circumstances to designate "critical habitat" for a

listed species:

> The Secretary, by regulation promulgated in accordance with

Page 8 - Complaint

subsection (b) of this section and to maximum extent prudent and determinable –

(A) shall concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

(B) may, from time-to-time thereafter as appropriate, revise such designation.

16 U.S.C. § 1533(a)(3).

18.    Critical habitat is defined in Section 3(5)(A) of the ESA:

The term "critical habitat" for a threatened or endangered species means-

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of this Act, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of this Act, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5).

19.    The Secretary can designate or revise critical habitat only "after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).  The Secretary has discretionary power to exclude areas from designation as critical habitat:

The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

*Id.*

Page 9 - Complaint

20.    On January 15, 1992 the FWS designated 6,887,000 acres of federal land as critical habitat for the northern spotted owl in 190 Critical Habitat Units (CHUs). 57 Fed. Reg. 1796, 1809. The CHUs were largely based on Habitat Conservation Areas proposed in 1990 by the Interagency Scientific Committee (J.W. Thomas, E.D. Forsman, J.B. Lint, E.C. Meslow, B.R. Noon, and J. Verner, *A Conservation Strategy for the Northern Spotted Owl* (1990)). 55 Fed. Reg. 1800-11.

21.    The FWS exercised its discretionary authority under 16 U.S.C. § 1533(b)(2) in 1992 to exclude all private and tribal lands from critical habitat, totaling about 3,100,000 acres, because the FWS believed the benefits of excluding these acres outweigh the benefits of inclusion. 57 Fed. Reg. at 1806.

22.    Subsequent to the northern spotted owl critical habitat designation, the Secretaries of Agriculture and Interior adopted the Northwest Forest Plan (NWFP) on April 13, 1994 for the federal lands within the range of the northern spotted owl. The NWFP established a set of land use allocations including late-successional reserves, connectivity blocks, managed late-successional areas, managed and reserve spotted owl pair areas and adaptive management areas where, along with other Congressionally reserved areas and administratively withdrawn areas, little or no timber harvest can occur.

23.    On February 10, 1994, FWS issued a biological opinion concluding that the NWFP as proposed was not likely to jeopardize the continued existence or result in destruction or adverse modification of designated critical habitat of the northern spotted owl. The FWS promised to "approach the public to re-examine the need for critical habitat if [the NWFP] is adopted." Final Supplemental Environmental Impact Statement on Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl, Appendix G,

Page 10 - Complaint

Letter from Marvin Plenart, Regional Director, Region 1 to Robert T. Jacobs, Team Leader, Interagency SEIS Team, February 10, 1994, page 1.

24.    In April 2002 plaintiffs in this case filed a complaint against the Secretary of Interior, challenging, among other things, the Secretary's failure to revise critical habitat as the FWS committed to do in 1994. *Western Council of Industrial Workers v. Secretary of Interior*, Civ. No. 02-6100-AA (D. Or.) The parties settled that case in 2003, and as part of the settlement the Secretary agreed to consider revising critical habitat for the northern spotted owl. 73 Fed. Reg. 47328. The Final Rule published on August 13, 2008 discharges that obligation, and completes the Secretary's performance of duties under the 2003 settlement agreement. *Western Council of Industrial Workers v. Secretary of Interior*, Civ. No. 02-6100-AA (D. Or.), Settlement Agreement, ¶8 ("any challenge AFRC brings against [the final regulation revising critical habitat] shall be brought solely by the filing of a new complaint ...."). The revised designation of critical habitat totals approximately 5,312,300 acres. 73 Fed. Reg. 47326.

25.    Pursuant to a settlement in *American Forest Resource Council v. Clarke*, No. C94-1031 (D.D.C. October 17, 2003), the BLM is currently revising management direction for its lands in Oregon through the Western Oregon Plan Revision (WOPR). The Final Rule assumed that the WOPR "is part of the baseline and consistent with this designation." 73 Fed. Reg. 47342.

26.    FWS regulations require the agency to include in any critical habitat designation the primary constituent elements (PCEs) that constitute the "physical or biological features (I) essential to the conservation of the species" in the statutory definition of critical habitat. 50 C.F.R. §424.12(b). The Final Rule establishes PCEs for northern spotted owl critical habitat:

> (2) The primary constituent elements of critical habitat for the
> northern spotted owl are:

Page 11 - Complaint

(i) Forest types that support the northern spotted owl across its geographic range. These forest types are primarily Sitka spruce, western hemlock, mixed conifer and mixed evergreen, grand fir, Pacific silver fir, Douglas-fir, white fir, Shasta red fir, redwood/Douglas-fir (in coastal California and southwestern Oregon), and the moist end of the ponderosa pine coniferous forests zones at elevations up to approximately 3,000 ft (914 m) near the northern edge of the range and up to approximately 6,000 ft (1,828 m) at the southern edge. These forest types may be in early-, mid-, or late-seral stages. This primary constituent element is essential to the conservation of the species because it provides the biotic communities that are known to be necessary for the northern spotted owl. This primary constituent element must occur in concert with at least one of the primary constituent elements described in paragraphs 2(ii) or 2(iii) of this entry.

(ii) Nesting, roosting, and foraging habitat. Forest types described in paragraph (2)(i) of this entry that contain one or more of the habitat types described below to meet the home range needs of territorial pairs of northern spotted owls throughout the year or that are habitat-capable of developing one or more of these habitat types. (As used in this entry, areas that are "habitat capable" of developing an essential habitat component are those forest types described in paragraph (2)(i) above, excluding serpentine soil areas, and that provide the requisite ecological conditions (e.g., moisture regime, soils, aspect, slope, potential vegetative community) for growing and sustaining the structural conditions required for that habitat component.)

(iii) Dispersal habitat. Forest types described in paragraph (2)(i) of this entry that provide one or both of the habitat components described for the dispersal of juvenile and non-territorial northern spotted owls, or that are habitat-capable of developing one or both of these components.

73 Fed. Reg. 47364.

27.    In the Final Rule, the Secretary determined that he would not exclude any areas from critical habitat under 16 U.S.C. § 1533(b)(2).  73 Fed. Reg. 47341 ("An exclusion under section 4(b)(2) of the Act requires a determination that the benefits of exclusion outweigh the benefits of designation, and is made at the discretion of the Secretary. We have considered such impacts,

Page 12 - Complaint

including the completion of an economic analysis of the proposed revised critical habitat designation, and determined not to make exclusions based on the record."). This power "falls under the discretionary authority of section 4(b)(2) of the Act." 73 Fed. Reg. 47342.

28. In particular, the Final Rule determined not to exclude any of the lands that BLM manages under the O & C Act. "Thus, after considering the relevant impacts in the record before us, we have chosen not to exclude the O&C lands on the basis of section 4(b)(2)." 73 Fed. Reg. 47343.

29. The FWS based its decision to decline to make any exclusions on its conclusion that although the economic cost resulting from the listing of the northern spotted owl exceeds $600 million per year, there are no incremental costs attributable to the designation of critical habitat except the minor administrative cost of federal agencies conducting 28 additional reviews per year under section 7 of the ESA:

> only the administrative costs of actions taken under section 7 of the Endangered Species Act that are specific to critical habitat for the northern spotted owl were considered to be incremental costs associated with the critical habitat designation. The economic analysis forecasts these incremental impacts associated with the revised designation of critical habitat to be $132,000 to $202,000 annualized over the next 20 years using a 7 percent discount rate, and $122,000 to $195,000 annualized using a 3 percent discount rate.

73 Fed. Reg. 47360.

30. The Council on Environmental Quality (CEQ) regulations implementing NEPA, which are binding on defendant Secretary of Interior, require that unless a federal agency has already determined that it is required to prepare an environmental impact statement (EIS) under NEPA, 42 U.S.C. § 4332(2)(C), the agency must prepare an environmental assessment (EA) to determine if a proposed action is likely to significantly impact the environment and therefore require preparation of an EIS. 40 C.F.R. §§ 1501.4(b), 1508.9. One of the key tasks in the environmental analysis is the

Page 13 - Complaint

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

examination of alternatives to the proposed action.  42 U.S.C. § 4332(2)(C)(iii).

31.    The FWS did not prepare either an EA or an EIS for the Final Rule based on its longstanding legal position that compliance with NEPA is not required for critical habitat designations outside the geographical area of the United States Court of Appeals for the Tenth Circuit:

> It is our position, that outside the Tenth Circuit, we do not need to prepare environmental analyses as defined by NEPA in connection with designating critical habitat under the Endangered Species Act of 1973, as amended.  We published a notice outlining our reasons for this determination in the Federal Register on October 25, 1983 (48 FR 49244).  This assertion was upheld in the U.S. Court of Appeals of the Ninth Circuit (*Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. Ore. 1995), *cert. denied*, 116 S. Ct. 698 (1996)).

73 Fed. Reg. 47364.  In *Catron County Board of Commissioners v. United States Fish and Wildlife Service*, 75 F.3d 1429, 1436 (10th Cir. 1996), the court held that NEPA compliance is required for a critical habitat designation.  The Tenth Circuit disagreed with the Ninth Circuit's earlier contrary decision in *Douglas County*.

32.    The Final Rule is causing current and threatened injury to plaintiffs, who have no remedy at law for these injuries.

## FIRST CAUSE OF ACTION
### (Violation of National Environmental Policy Act)

### FIRST CLAIM FOR RELIEF
(Violation of NEPA -- failure to prepare EA or EIS)

33.    Plaintiffs repeat and reallege the allegations in paragraphs 1-32 as if fully set forth herein.

34.    FWS violated NEPA by issuing the Final Rule designating critical habitat for the northern spotted owl without preparing an EA or EIS.

35.    The FWS' failure to prepare an EA or EIS for the Final Rule is arbitrary and capricious,

Page 14 - Complaint

an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

## SECOND CAUSE OF ACTION
**(Abuse of discretion under 16 U.S.C. § 1532(5) and 16 U.S.C. § 1533(a))**

### SECOND CLAIM FOR RELIEF
(Violation of APA – Abuse of discretion in defining critical habitat in fire-prone eastside provinces contrary to best available scientific and commercial data)

36.    Plaintiffs repeat and reallege the allegations in paragraphs 1-32 as if fully set forth herein.

37.    "The revised critical habitat is based on the 2008 final recovery plan." 73 Fed. Reg. 47329. The Final Recovery Plan "incorporates the best available scientific information regarding the conservation of the northern spotted owl." 73 Fed. Reg. 47326. FWS no longer considers the 2007 Draft Recovery Plan to be the best available scientific data: "This final plan reflects substantial revisions to the 2007 draft plan made in response to public and peer review comments, as well as additional independent scientific review." 73 Fed. Reg. 47329. "This final revision of critical habitat is based on the 2008 final recovery plan ... and not on the original draft plan." 73 Fed. Reg. 47335.

38.    "One of the significant departures in the 2008 final recovery plan, as revised from the 2007 draft recovery plan, is that it eliminates the MOCA system on the dry forest provinces east of the Cascade Mountain crest in Washington and Oregon where habitat loss from stand-replacing fires has been relatively high." 73 Fed. Reg. 47327. "The 2008 final recovery plan recognizes that a different management strategy is necessary in the dry, eastside provinces that are characterized by frequent disturbance." 73 Fed. Reg. 47335. "The 2008 final recovery plan describes a landscape management approach in the more fire-prone eastside provinces of the spotted owl to best ensure sufficient spotted owl habitat persists in a strong and increasing disturbance regime." *Id.* "The

Page 15 - Complaint

landscape approach in fire-prone forests of the Eastern Washington Cascades, Eastern Oregon

Cascades, and California Cascades reflects the need to modify the strict reserve-based approach in

more dynamic ecosystems." 73 Fed. Reg. 47336.

39.    The Final Recovery Plan presents the scientific basis for this conclusion:

> On the fire-dominated east side of the Cascade Mountains in
> Washington and Oregon, and the California Cascades, the habitat
> management strategy described here is intended to maintain spotted
> owl habitat in an environment of frequent natural disturbances. No
> MOCAs are identified in these Provinces, given the assumption that
> the severe natural disturbance regime precludes long-term persistence
> of any static habitat management areas. Rather, a landscape approach
> is described—one that promotes spotted owl recovery within the
> broader goal of ecological sustainability.

Final Recovery Plan at 14. The Final Recovery Plan recommends against trying to preserve

geographically-defined areas of spotted owl habitat: "[I]it is unlikely that designating spotted owl

habitat reserves within fire-prone landscapes will be effective." *Id*. at 20. "The maintenance of

Northern Spotted Owl habitat in dry forests cannot sustainably rely on designated reserves in risk-

rich landscapes." *Id*. at 110-11.

40.    The Final Rule disregards the best science in the 2008 Final Recovery Plan and instead

designates critical habitat in the fire-prone eastside provinces based on the recommendations of the

2007 Draft Recovery Plan. 73 Fed. Reg. 47326. The FWS relied on the draft recovery plan even

though "[t]hree peer reviewers recommended that the Service not rely on the 2007 draft recovery

plan as the basis for critical habitat designation." 73 Fed. Reg. 47328.

41.    The best available science represented in the Final Recovery Plan does not identify the

designated critical habitat areas in the fire-prone eastside provinces, or any areas in those provinces,

as containing "physical or biological features (I) essential to the conservation of the species." 16

Page 16 - Complaint

U.S.C. §1532(5)(A).  To the contrary the best available science shows that no specific area in the fire-prone eastside provinces contains features essential for conservation because "it is unlikely that designating spotted owl habitat reserves within fire-prone landscapes will be effective," Final Recovery Plan at 20, and "[t]he maintenance of Northern Spotted Owl habitat in dry forests cannot sustainably rely on designated reserves in risk-rich landscapes." *Id*. at 110-11.

42.    The FWS's sole explanation for its acknowledged departure from the best available science is administrative convenience:

> The landscape strategy of moving habitat patches recommended for the eastside provinces does not translate easily into critical habitat, which is defined by statute as "specific areas" and which, per our implementing regulations, must "be defined by specific limits using reference points and lines as found on standard topographic maps of the area" (16 U.S.C. 1532(5)(A) and 50 CFR 424.12(c)).

> [D]esignating critical habitat requires that specific geographic boundaries be described and mapped; such a requirement does not match with a landscape management approach involving a system of moving habitat patches over time.

73 Fed. Reg. 47337.  The fact that the best available science "does not translate easily into critical habitat," or that the legal requirement of critical habitat "does not match" with the best available science is not a justification for disregarding the best available science and relying on a draft report FWS admits is no longer the best available science.  FWS abused its discretion in designating areas as critical habitat in the fire-prone eastside provinces that do not meet the statutory definition of critical habitat and are not supported by the bet available science.  This violation is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

Page 17 - Complaint

## THIRD CLAIM FOR RELIEF

(Violation of APA – Abuse of Discretion
in Defining "Habitat-Capable Areas" as Critical Habitat)

43.    Plaintiffs repeat and reallege the allegations in paragraphs 1-32 as if fully set forth herein.

44.    The FWS found that the primary constituent elements of northern spotted owl critical habitat are features that provide for nesting, roosting, foraging or dispersal habitat.  73 Fed. Reg. 47364-65.  The FWS identified the forest types that provide nesting, roosting, foraging or dispersal habitat for northern spotted owls.  *Id.*  FWS determined that only the specific areas within the Managed Owl Conservation Areas (MOCAs) described in the 2008 Final Recovery Plan for the northern spotted owl contain features that are essential to the conservation of the species.  73 Fed. Reg. 47329.  Forested areas outside the MOCA system are not essential to the conservation of the species, and for that reason are not designated as critical habitat.

45.    FWS determined that an area within a MOCA that does not currently contain any nesting, roosting, foraging or dispersal habitat for northern spotted owls nonetheless constitutes critical habitat if the area is "habitat-capable of developing one or more of these habitat types."  73 Fed. Reg. 47364-65. FWS announced that any area of the specified forest types would be considered ''habitat capable'' if the area "provide[s] the requisite ecological conditions (e.g., moisture regime, soils, aspect, slope, potential vegetative community) for growing and sustaining the structural conditions required for that habitat component."  73 Fed. Reg. 47364.  Under this definition, any area that could be planted with trees that might some day grow into spotted owl nesting, roosting, foraging or dispersal habitat is within the definition of critical habitat, regardless of the current condition of the area, the likelihood the requisite trees may be planted, or the period of time before such habitat could come into existence.

Page 18 - Complaint

46.    The Final Recovery Plan estimates that 45% of the area within the MOCA system does not currently contain nesting, roosting, foraging or dispersal habitat for northern spotted owls. Final Recovery Plan, Table C-6. The areas that do not currently contain such habitat were recommended for protection based on their potential for growing such habitat in the future (i.e., their "habitat-capable" status). The MOCAs also include some 100,000 acres of land (2% of the entire designated area) that can never develop into spotted owl habitat. *Id.*

47.    Within the geographical area occupied by the species at the time of listing, the ESA limits critical habitat to specific areas "on which <u>are found</u> those physical or biological features (I) essential to the conservation of the species." 16 U.S.C. § 1532(5) (underlining added). The 1992 spotted owl designation stated that "[t]he Service's intent in designating critical habitat for the northern spotted owls is to provide protection for habitat that <u>contains</u> constituent habitat elements in sufficient quantities and quality to maintain a stable population of owls throughout the owl's range." 57 Fed. Reg. 1806 (underlining added). The FWS has never before interpreted the term "are found" in the critical habitat definition to mean "might grow into in the future."

48.    The June 12, 2007 Draft Rule did not contain any comparable definition of "habitat-capable" areas as critical habitat. The Final Rule does not even acknowledge this profound definitional change in the section of the Final Rule captioned "Summary of Changes from Proposed Revised Critical Habitat," 73 Fed. Reg. 47350, does not explain the reason for the abandonment of the agency's prior interpretation or the change between the draft and the final rule, and does not justify the FWS's failure to allow the public the opportunity to comment on the "habitat-capable" definition, which should have been permitted under the rulemaking provisions of the APA, 5 U.S.C. §§553 et seq.

Page 19 - Complaint

49.    The FWS' designation of "habitat-capable" areas as critical habitat for the northern

spotted owl, its failure to provide a rational explanation for abandonment of the contrary position and

its change from the Draft Rule to the Final Rule, its failure to permit public comment on the "habitat-

capable" definition, and its designation of other areas that are not even habitat-capable are arbitrary

and capricious, an abuse of discretion, not in accordance with law, without observance of procedure

required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF

(Violation of APA – Abuse of discretion in defining critical habitat
"within the geographical area occupied by the species, at the time it is listed"
that is not limited to areas of documented occupancy)

50.    Plaintiffs repeat and reallege the allegations in paragraphs 1-32 as if fully set forth herein.

51.    FWS construed the term ""within the geographical area occupied by the species, at the

time it is listed" in the definition of critical habitat to refer to anywhere within the range of the

northern spotted owl subspecies from British Columbia, Canada to Marin County, California, and

determined that the term is not "narrowly restricted to small areas of documented occupancy":

> This designation is entirely within the geographic range of the northern spotted owl
> occupied at the time of listing, as can best be reasonably determined by a
> combination of historic and recent documented occupancy, known historical
> distribution, and distribution of current appropriate habitat. We do not believe that
> the designation of critical habitat under section 3(5)(A)(I) of the Act is narrowly
> restricted to small areas of documented occupancy, particularly for a wide-ranging
> species where such a level of detail across the range is rarely, if ever, achievable.
> Reasonable determinations of occupancy have been made based upon a variety of
> data sources available to the Service.

73 Fed. Reg. 47338. Based on this definitional determination FWS did not attempt to identify areas

actually occupied by northern spotted owls at the time of listing, to limit the designation to such

areas, or to decide if designating areas not occupied at the time of listing is essential for the

Page 20 - Complaint

conservation of the species.  FWS did not describe the "reasonable determinations of occupancy" that "have been made," did not explain the basis for such determinations, and did not identify the "variety of data sources" on which those determinations were made.

52.    This definitional determination is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

**THIRD CAUSE OF ACTION**
**(Abuse of discretion under U.S.C. § 1533(b)(2))**

**<u>FIFTH CLAIM FOR RELIEF</u>**

(Violation of APA – Abuse of discretion in evaluating economic effects of designating or excluding particular areas under 16 U.S.C. § 1533(b)2))

53.    Plaintiffs repeat and reallege the allegations in paragraphs 1-32 as if fully set forth herein.

54.    In *Western Council of Industrial Workers v. Secretary of Interior*, Civ. No. 02-6100-AA (D. Or.) plaintiffs asserted that the FWS consideration of economic effects for the 1992 critical habitat designation used the "baseline approach" determined to be unlawful in *New Mexico Cattle Growers Association v. United States Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001).  In the Settlement Agreement in that case, defendant Secretary admitted that *New Mexico Cattle Growers Association* "addresses the proper scope of economic analysis under ESA Section 4(b)(2) in designating critical habitat," and agreed that "the Service's analysis of potential economic effects of designating NSO critical habitat is in some respects inconsistent with the decision in <u>New Mexico Cattle Growers</u>." *Id*. at 2.

55.    The Economic Analysis supporting the 2008 Final Rule employs a baseline analysis virtually identical to that held unlawful in *New Mexico Cattle Growers Association*. The Economic

Page 21 - Complaint

Analysis finds that the only incremental economic effect of the 5,312,300 acre critical habitat designation is the trivial administrative cost of $120,000-$200,000 per year to federal agencies conducting 28 additional Section 7(a)(2) consultations under the ESA that would not otherwise occur in the absence of designated critical habitat. 73 Fed. Reg. 47342.

56.     The Economic Analysis concluded that the WOPR preferred alternative provides for 36-38 million board feet per year of timber harvest to originate from areas designated as critical habitat. *Id.* FWS assumes that every project within designated critical habitat would be allowed to proceed as proposed, with no changes resulting from the adverse modification standard applicable to critical habitat in Section 7(a)(2). 73 Fed. Reg. 47361 ("The economic analysis projects that there will be no changes in management of any habitat resources that entail quantifiable costs resulting from these additional consultations over the 20–year period."). The Economic Analysis therefore assumes no reduction in timber production from the critical habitat designation. 73 Fed. Reg. 47343 ("[T]he analysis does not attribute timber harvest reductions to critical habitat."); Economic Analysis at 61 ("Following the designation, there would be no incremental impacts of critical habitat related to timber resources.").

57.     The effect of the FWS position is that it continues to apply its regulatory definition of adverse modification subsuming that term within the statutory meaning of "jeopardy" even though in *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004), *amended*, 387 F.3d 978 (9th Cir. 2004), the Ninth Circuit determined the FWS adverse modification regulation is not valid. By depriving the adverse modification standard of any content independent of the jeopardy standard, the Economic Analysis is inconsistent with *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service* and commits precisely the error proscribed by *New Mexico Cattle*

Page 22 - Complaint

*Growers Association.*

58.    The Economic Analysis for the Final Rule actually reduces the level of incremental

economic effect of critical habitat from the 1992 designation.  The earlier designation had attributed

an annual reduction of 102 million board feet of timber production to the critical habitat designation.

57 Fed. Reg. 1815.  FWS has failed to acknowledge the shift in its analysis to zero reduction, to

explain the basis for its differing conclusion in the current decision, or provide a rational explanation

for its conclusions.

59.    FWS also based its decision not to exclude any particular areas under 16 U.S.C. §

1533(b)(2) in part on its assumption that the adverse modification standard in Section 7(a)(2) allows

FWS to consider the effects of areas of protected habitat that are not designated as critical habitat:

> The Federal lands comprising the MOCA network of the final recovery
> plan include areas of congressionally reserved lands, such as designated
> wilderness areas; these areas were therefore included in the recovery
> plan's assessment that the MOCA network is sufficient to achieve the
> recovery of the northern spotted owl[.] As in the 1992 designation of
> critical habitat, congressionally-reserved lands such as wilderness areas
> and national parks are not included within the boundaries of the critical
> habitat designation. However, the contribution of these congressionally-
> reserved areas must be considered in any evaluation of the sufficiency of
> the overall conservation habitat network for the recovery of the northern
> spotted owl.

73 Fed. Reg. 47328.

60.    The assumption that areas not designated as critical habitat can influence the agency's

protection of designated critical habitat is contrary to the ruling in *Gifford Pinchot Task Force v. U.S.*

*Fish and Wildlife Service*, 378 F.3d at 1075-76:

> Congress told the FWS to designate critical habitat and ensure that the designated
> critical habitat is not adversely modified. It matters not if there is worthwhile and
> possibly suitable habitat outside of the designated "critical habitat;" what
> mattered to Congress, and what must matter to the agency, is to protect against

Page 23 - Complaint

> loss or degradation of the designated "critical habitat" itself. We hold that the agency's finding that loss of critical habitat was not an "adverse modification" because of the existence of suitable external habitat is arbitrary and capricious and is contrary to law.

61.     The designation of critical habitat for the northern spotted owl without a legally adequate economic effects analysis as required by 16 U.S.C. §1533(b)(2) or an adequate explanation for the decision is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF

(Violation of APA – Arbitrary and capricious decision and abuse of discretion in determining not to exclude O & C Lands from critical habitat)

62.     Plaintiffs repeat and reallege the allegations in paragraphs 1-32 as if fully set forth herein.

63.     The O&C Act mandates that the BLM manage O&C timberlands "for permanent forest production" and directs that the "timber thereon shall be sold, cut, and removed in conformity with the principle of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating streamflow, and contributing to the economic stability of local communities and industries." 43 U.S.C. §§ 1181a *et seq.* The statutory mandate creates a "dominant use" of the O & C Lands for permanent forest production. Under the O & C Act 50% of timber sale receipts are provided to the 18 counties in which the O & C Lands are located, providing a substantial source of government revenues for these localities.

64.     FWS rests its economic analysis on the assumption that the BLM will implement its proposed preferred alternative (Alternative 2) presented in the Draft Environmental Impact Statement for the Western Oregon Plan Revisions (WOPR DEIS). Economic Analysis at 43 ("For this analysis,

Page 24 - Complaint

only implementation of BLM's Preferred Alternative (PA) identified in the WOPR DEIS was considered."). Yet the FWS exclusion analysis assumes contradictorily that "if critical habitat were not designated on O&C lands, the likely outcome would be that BLM would manage the O&C lands to utilize its authority to avoid jeopardy by adopting its proposed Alternative 3, or some variation of it," 73 Fed. Reg. 47361, with a much lower timber harvest total than Alternative 2, leading FWS to the wholly irrational conclusion that "from a timber management perspective, there may be greater economic benefits to the designation of critical habitat as opposed to not designating critical habitat." *Id.* The use of these conflicting assumptions is arbitrary and capricious and an abuse of discretion.

65.    The two primary management objectives of Alternative 3 are to "[p]rovide for the habitat conditions that are required for late-successional species" and to "[m]aintain or promote the development of mature or structurally complex forests." WOPR DEIS, Chap. 2 at 90. Alternative 3 is not permissible under the O & C Act because Alternative 3 does not allow permanent forest production to be the dominant use of the O&C lands. The Secretary significantly underestimated the impacts of designating O & C timberlands as critical habitat by assuming that if no critical habitat is designated the BLM would violate the O & C Act through implementation of unlawful Alternative 3.

66.    The Secretary failed to consider how the designation of critical habitat would impair the BLM's ability to manage the O&C lands to achieve permanent forest production, failed to consider how designation would constrain county receipts from timber sales, and failed to properly consider the statutory mandate of the O & C Act or the value of country timber sale receipts in deciding not to exclude any of the O & C timberlands from critical habitat. The Secretary's failure to exclude the O&C timberlands from critical habitat is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory

Page 25 - Complaint

authority and short of statutory right under 5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION
### (Violation of Regulatory Flexibility Act, 5 U.S.C. §§601 et seq. and Unfunded Mandates Reform Act, 2 U.S.C. §§1501 et seq.)

### SEVENTH CLAIM FOR RELIEF

(Violation of Regulatory Flexibility Act, 5 U.S.C. §§601 et seq. and
Unfunded Mandates Reform Act, 2 U.S.C. §§1501 et seq.)

67.    Plaintiffs repeat and reallege the allegations in paragraphs 1-32 as if fully set forth herein.

68.    Under the Regulatory Flexibility Act, 5 U.S.C. §§ 601 et seq., as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996, P.L. 104-121 (March 29, 1996), when an agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effect of the rule on small entities (i.e., small businesses, small organizations, and small government jurisdictions), unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.

69.    Under the Unfunded Mandates Reform Act, 2 U.S.C. §§1501 et seq., an agency must determine if a rulemaking will "significantly or uniquely" affect small governments or produce a Federal mandate on State, local, or tribal governments or the private sector of $100 million or greater in any year.

70.    FWS determined under the Regulatory Flexibility Act, 5 U.S.C. §§601 et seq. and Unfunded Mandates Reform Act, 2 U.S.C. §§1501 et seq. that a regulatory flexibility analysis is not required for the Final Rule because the only impacts of the rule are the minor administrative costs imposed on federal agencies and therefore "this rule will not have a significant economic impact on a substantial number of small entities." 73 Fed. Reg. 47363. This determination is erroneous because

Page 26 - Complaint

the agency's underlying determination that the Final Rule has no effects beyond the minor administrative costs for federal agencies is arbitrary and capricious as shown above.

71.    This determination under the Regulatory Flexibility Act, 5 U.S.C. §§601 et seq. and Unfunded Mandates Reform Act, 2 U.S.C. §§1501 et seq. is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. §706(2).

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

1. A declaration that the FWS' failure to prepare an EA or EIS for the Final Rule violates NEPA, 42 U.S.C. §§ 4332(2)(C), and the CEQ regulations, 40 C.F.R. §§ 1501.4(b), 1508.9, and is therefore arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2); and an injunction requiring defendant promptly to prepare an EA or an EIS under NEPA, 42 U.S.C. §§ 4332(2)(C) and the CEQ regulations, 40 C.F.R. §§ 1501.4(b) and 1508.9 for the designation of spotted owl critical habitat, and to continue to enforce the Final Rule until defendant issues a new Final Rule in compliance with NEPA.

2. A declaration that the designation in the Final Rule of critical habitat in the fire-prone eastside provinces as described herein is contrary to the best scientific data available and is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2); and an injunction directing defendant to promptly issue a new Final Rule consistent with this paragraph and to continue to enforce the Final Rule until defendant issues a new Final Rule.

Page 27 - Complaint

3.  A declaration that the FWS' inclusion in the Final Rule of "habitat-capable" areas as critical habitat for the northern spotted owl, its failure to provide a rational explanation for abandonment of its long-held contrary position and its change from the Draft Rule to the Final Rule, and its failure to allow public comment on the "habitat-capable" definition, and its designation of other areas that are not even habitat-capable are arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2); and an injunction directing defendant to promptly issue a new Final Rule consistent with this paragraph and to continue to enforce the Final Rule until defendant issues a new Final Rule.

4.  A declaration that FWS's failure in the Final Rule to identify areas actually occupied by northern spotted owls at the time of listing, and to limit the designation to such areas unless it determines that designating areas not occupied at the time of listing is essential for the conservation of the species is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2); and an injunction directing defendant to promptly issue a new Final Rule consistent with this paragraph and to continue to enforce the Final Rule until defendant issues a new Final Rule.

5.  A declaration that FWS's designation of critical habitat in the Final rule without a legally adequate economic effects analysis as required by 16 U.S.C. §1533(b)(2) or an adequate explanation for the decision is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2); and an injunction directing defendant to promptly issue a

Page 28 - Complaint

new Final Rule consistent with this paragraph and to continue to enforce the Final Rule until defendant issues a new Final Rule.

6. A declaration that the FWS's designation of critical habitat in the Final Rule without fully, accurately and adequately considering the statutory mandate of the O & C Act and the value of county timber sale receipts in deciding not to exclude any of the O & C timberlands from critical habitat is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2); and an injunction directing defendant to promptly issue a new Final Rule consistent with this paragraph and to continue to enforce the Final Rule until defendant issues a new Final Rule.

7. A declaration that the FWS's determination in the Final Rule under the Regulatory Flexibility Act, 5 U.S.C. §§601 et seq. and Unfunded Mandates Reform Act, 2 U.S.C. §§1501 et seq. that a regulatory flexibility analysis is not required for the Final Rule is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. §706(2); and an injunction directing the Secretary to promptly issue a new Final Rule consistent with this paragraph and to continue to enforce the Final Rule until defendant issues a new Final Rule.

8. An award of plaintiffs' attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

Page 29 - Complaint

9.  Granting plaintiffs such further relief as may be just, proper and equitable.

Dated this 13th day of August, 2008.

By: _____

James T. McDermott, D.C. Bar No. 404886
jmcdermott@balljanik.com
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland OR 97204
Telephone:  (503) 228-2525
Facsimile:  (503) 226-3910

Mark C. Rutzick, D.C. Bar No. 979547
markrutzick@cox.net
Mark C. Rutzick, Inc.
12402 Myra Virginia Ct.
Oak Hill, VA 20171
Telephone/Facsimile: (703) 870-7347

Attorneys for Plaintiffs

Page 30 - Complaint

08-1409
EGS

# CIVIL COVER SHEET

JS-44
Rev. 1/05 DC)

## I (a) PLAINTIFFS

CARPENTERS INDUSTRIAL COUNCIL; AMERICAN FOREST RESOURCE COUNCIL; SWANSON GROUP, INC; ROUGH & READY LUMBER CO.; PERPETUA FORESTS COMPANY; SENECA JONES TIMBER COMPANY

88886

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**      88888
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

James T. McDermott, D.C. Bar No. 404886, jmcdermott@balljanik.com
BALL JANIK LLP, 101 SW Main Street, Suite 1100, Portland OR 97204
Telephone : (503) 228-2525, Facsimile: (503) 226-3910

Mark C. Rutzick, D.C. Bar. No. 979547, markrutzick@cox.net
Mark C. Rutzick, Inc., 12402 Myra Virginia Ct ., Oak Hill VA 20171
Phone/Fax: 703-870-7347

## DEFENDANTS

**DIRK KEMPTHORNE, Secretary of Interior**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Case: 1:08-cv-01409
Assigned To : Sullivan, Emmet G.
Assign. Date : 8/13/2008
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
✕ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**◉ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
✕ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**        OR        **○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

3

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions** (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

◉ **1 Original Proceeding**   ○ **2 Removed from State Court**   ○ **3 Remanded from Appellate Court**   ○ **4 Reinstated or Reopened**   ○ **5 Transferred from another district (specify)**   ○ **6 Multi district Litigation**   ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

42 U.S.C. §§ 4321 et. seq., 5 U.S.C. §§601, 2 U.S.C. §§1501, 16 U.S.C. §§ 1533 - unlawful designation of critical habitat for northern spotted owl

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | DEMAND $ ⌐ ⌐ ⌐ ⌐ ⌐ ⌐ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐   NO ☐ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

**DATE** 8/13/08   **SIGNATURE OF ATTORNEY OF RECORD** _C/N/A_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed **only** if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the **primary** cause of action found in your complaint. You may select only **one** category. You **must** also select **one** corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.